Good afternoon, your honors. My name is Aaron Lawson. I'm here on behalf of Michael Simmons. I'd like to, with the court's permission, put to one side the purely legal issues presented by this appeal and focus just on the more factual issues that are presented by the record. And the court below charter moved for summary judgment on the basis of an affirmative defense. So its burden at that point was to come forth with evidence that, if unrebutted, would compel a reasonable fact finder to conclude that they had established and implemented with due care reasonable practices and procedures that would prevent telephone calls in violation of the do not call rights created by the FCC under the TCPA. And this they didn't do. Sort of the crux of their defense here is that they have a strong degree of confidence in the numbers they receive from their vendors. Strong degree of confidence, high degree of confidence, this is sort of a mantra they repeat. And this assertion turns on testimony that begins around page 48 of our appendix. This is their 30B6 opponent, Mr. Link. And at this point he said that they retrieve numbers through a process essentially known as skip tracing and also admitted that they have no way of double checking these numbers. So the confidence that Charter expresses in the numbers that they have comes from sort of the next portion of his testimony. When he says that we only ask for certain confidence intervals or confidence levels, right, he says higher or lower. He doesn't know what they are. Can't say what they are conclusively. Isn't really sure what they ask for. He says that, quote, we restrict them. He doesn't say how. And then the next few pages he says no or I don't know to some more questions about what kind of checks are put on this process. So this is really where their whole assertion of the affirmative defense turns, right, because ‑‑ Is skip tracing permissible under this statute? Sure. I think skip tracing is permissible. I think what you can't do ‑‑ It's not going to be fail safe. Right. Of course, it's not going to be fail safe. And our position isn't that skip tracing needs to be perfect in all instances. It's just that ‑‑ and I think Charter recognizes this. You have to put some checks on what's going on. And our point is that we have no idea really what these checks are at this point, right? And it matters here because one of the other things that Charter points out, right, is that they scrub or check their calling lists against the do not call registry. But in this case, even though this number, Mr. Simmons' number, was scrubbed, that scrub was ignored because they were wrong about who this person was, which is why the checks you put on skip tracing in the first place. Do we know that Sophie Simmons was not also at that number in addition to Michael Simmons? They are not related. So my best guess is that she was not at that number. That's a guess. I mean, she could be there. I mean, it's not in the record. But they don't live at the same address. And I believe that is not her number. They do or they don't? They don't. They don't. Mr. Simmons acquired that number when he lived in San Luis Obispo. He doesn't live in San Luis Obispo anymore. But he never lived with Sophie Simmons, and so she would never have been a subscriber to that number. So we have these checks that are ignored, and we have this skip tracing, and there are supposedly sort of safeguards placed on what's happening there, and we don't know what they are. And so our point is that this is not evidence that would compel a reasonable fact finder to conclude that Charter had established, by a preponderance of the evidence, that it has reasonable practices and procedures to prevent. And this would actually just be on our theory under the National Do Not Call Regulation 1200C. I'd like to ask you to slow down a little bit. Sorry, nerves. So we have this problem, and I would also point out that there's some evidence in the record to suggest that perhaps the way that the lists are put together might ultimately bear on this question as well. The District Court and Charter are still on appeal. We keep referring to Sophie Simmons as a current customer, and she is current within the meaning, really, of the Do Not Call Regulation because they have the established business relationship designation stretches beyond the time when she would have turned off her Charter services. But she wasn't current in the colloquial sense when she had been called, and I think this is important because this is a calling campaign, the one that sort of swept up Michael Simmons, was a calling campaign of current, sort of in the colloquial sense, customers who had some Charter service and Charter was hoping to sell them an additional service. So we have this number that was obtained through a process about which we know very little and that was called as part of a campaign that the evidence suggests it should not have been part of. And so our position is that under 1200C, this is just insufficient on the notion. Is it reasonable for a charter to rely upon a service for which it pays to do skip tracing and to call a number that a skip tracer identifies, in this case wrongly, as an ongoing customer? If there's a good reason to believe, I think, if there's a good reason to believe that that number is correct. Well, the question I'm asking is, if you hire a skip tracer firm that does this, is it reasonable to believe that you will, with a reasonable degree of accuracy or a sufficient degree of accuracy, reach the person you want to get to? If there are indicia of that accuracy, yeah. I'm not going to stand here and say that skip tracing, there's no reason or no circumstance under which a charter could ever not rely. There's going to be a universe of instances. We don't really have any evidence that would suggest that this is one of those instances because we don't know what these confidence intervals or confidence levels are. We don't know how the skip tracer relevant here comes to those conclusions. I think all of this goes into determining whether or not this is the kind of instance in which it would have been okay to rely on that representation. This evidence raises a lot of questions. Confidence interval also suggests that perhaps Relevate has provided them with multiple numbers and they say, we are, let's say, 80% sure that it's one of these three. I think that that would be a real problem, but, of course, we don't know any of this for sure because the record is so brief, which is why we contend it was error to grant summary judgment. I'll move to the 1200D claim or theory, I suppose, because you couldn't recover more than once for a single call. Moving to that theory, there is, of course, the threshold question,  I think the briefs do a very good job of laying out sort of the two sides of that. I would say, though, that it had been sort of a theme of both parties' briefing in the district court and now ours in appeal that really you have to interpret the regulation in light of the statute because the regulation is implementing the statute. And because of that, there is no reason to say that the statute requires the procedures as an affirmative defense and then the regulation turns around and makes them an element of the prima facie case. But that, to one side, I think is sort of the same. We have a lot of the same problems here. They're not evidentiarily the same, but we have a process that it appears there was some error in, not error, but some problem recording this do-not-call request, and that, as the district court recognizes, bears on the care with which the process was implemented. And because we have this. In terms of that, your client either did or did not, I think we have to assume your client did say don't call at the outset. Yes. And it was 11 days later that your client said don't call. Again. And then it was four days after that. That he was finally. Yeah. Yes. So the first request seems to have been ignored, and he was finally put on a couple weeks afterwards. We know from the evidence that this particular telemarketing firm had the ability not only to immediately record that request for their own internal purposes, but that they would upload that request to charter's databases so that its other telemarketers would have access to that information within the week. And that didn't happen. And the FCC has told us that that is problematic under 1200D, in addition to the fact that it bears on the question of implementation. But it was within 30 days. Ultimately, yes, it was within 30 days. But you're saying it has to be as fast as possible. I'm saying so the FCC's explanation of its own regulation is that if you have the ability to do it, you do it when you have the ability to do it. That's in their 2003 order that we say, 18 FCC record 14014. The purpose of that is to make sure people don't say, well, I'll wait 30 days, in the meantime I'll keep calling them as many times as I can. I would hope that that is true because that would clearly not be in keeping with the statute. But even then, I think we're looking at a set of facts that a fact finder could come to sort of conclusions about. One, either they're doing it with reasonable care because they get it fairly quickly, or they're not because it took repeated requests to stop calling for that request to be entered, and it happened more slowly than we know this telemarketer has the capability of doing so. Whose burden is it to prove that? I think that rests with charter because that's an element of the procedures under 1200D, and so under the statute that is part of their affirmative defense. They would have to get the information from Imperion, which actually made the call, right? Sure. So it's not like charter gets that instantly. No, no. But Imperion, we know from the deposition of Imperion's representative, that this is information that they give to charter on a weekly basis. So that's kind of what I'm resting on here, that it did not happen within the week. And you see this at 162 of our appendix, page 162. They're saying, we can record this and put it into practice immediately, and they use the words propagate that up to charter on a weekly basis. So if all had gone according to plan, it should have happened more quickly. There should not have been four calls. There might have been at most two, but really it should have been one. And because we have that sort of delay, we have facts from which really competing inferences can be drawn. So for that reason, summary judgment was inappropriate. Thank you. Thank you. Good morning, or good afternoon. I'm not sure what time it is. Raghun Resh on behalf of Charter of the Appellee. May it please the Court. As its name suggests, the safe harbor of the TCPA is intended to provide protection to a company if they place a call to somebody on the do not call list, despite having made reasonable efforts to avoid doing so. We have availed ourselves of this defense since the outset of the case. So it's your burden. Well, on section C, it is our burden. No question about that. And the dispute is solely on D, where the burden lies. But since the outset of the case, we have made the plaintiff's counsel and Mr. Simmons aware that our view is Charter has multiple procedures in place to avoid doing this. And it's possible that one of these got through, and that's what happened here. But that's, again, the purpose of the safe harbor is to protect. If you have reasonable procedures in place and you've implemented them, then it protects you if you accidentally make a phone call to somebody who shouldn't have received that phone call. But the reasonableness of a procedure, measurable by the level of confidence, you can derive from implementing it. And that gets you to your adversary's argument that we don't even know what level of confidence Relevate was using or was directed to use. What the FCC has explained in the dynasty mortgage case, the second dynasty mortgage case, was, quote, the safe harbor in our rules thus recognizes that a telemarketer's intent to avoid unlawful calls is best evidenced by detailed compliance procedures and adherence to basic requirements, such as timely access to the registry. And what that's referring to is a series of regulations promulgated as a result of the statute that set forth what some refer to as these indicia of reasonableness, these I's you need to dot and these T's you need to cross to say, do you have written policies? Do you train your personnel? Do you access on a regular basis the do not call list? And all of those were presented by charter as part of the summary judgment record. Some of those were undisputed below. Many of those were disputed below, and the district court found in our favor on all of them, and most of those have been abandoned on appeal. And so when you talk about the procedures, I think one needs to look at them as a whole to begin with, and they don't take issue with the vast majority of charter having satisfied all these I's and dotted all these I's and crossed all these T's. The one issue they take is with respect to the confidence level for skip tracing, and as Your Honor mentioned, there's nothing about the confidence level for skip tracing is all in all because if that's sloppy or they don't care, then all of your other measures fail, right? Well, if it is sloppy, then it would impact some of the phone calls. Remember, it only applies to people for whom charter is missing a phone number and for people who are on the do not call registry. It's not the whole population. It comes down to a very small number to begin with, but then the premise of the argument that it is sloppy is something that the evidence does not support. Now, the fundamental premise of their argument, and Your Honor referred to it, is that skip tracing is inherently sloppy, inherently inaccurate, and there's no evidence in the record. No, but your evidence said that he's not challenging that practice. Right, but there's also no evidence in the record to suggest that it is, in fact, sloppy writ large, right, that there are many errors made to begin with with respect to skip tracing, particularly, and this is the point Your Honor was referencing, when a company like charter hires companies in the business of providing this kind of service, right? It would be one thing if they hired me, some guy who's Googling, saying, oh, I'm looking for a phone number for Judge Jacobs. Let's see if I can find one. I found a Mr. Jacobs in New York. That would be pretty unreliable, but charter hires companies that are in the business of providing the service, and then even on top of that, and the record is clear on this as well, even on top of that, charter imposes safeguards to say we're not accepting all of your results, and this is, I believe, what Mr. Lawson was referring to at page A48 of the appendix. Question, when you get that information back from Relevate, that's the skip tracing vendor, is there any sort of confidence level or score or flag or anything of that nature associated with it? Answer, yes, there is. There are confidence intervals that vendors will perform on their matching, and we specify what confidence intervals we will only accept. Then at A49, answer, I know we only ask for the top one or two levels of confidence in the match. Or three somewhere. A maximum of three from any of our vendors. We restrict them. We don't know what, one, two, or three? What we know is only four confidence intervals. That would go pretty down the line, wouldn't it? No, it would be far more than that. And the following question asked by Mr. Simmons' counsel was asking what are we talking about here. He said something along the lines of certain, almost certain, highly likely something of that sort, and charter's corporate representative said yes, that's a fair way to describe it. And so it's a scale, clearly, starting from certain, 100%, almost certain, highly likely, and less so. And charter's representative said, and unrebutted evidence in the record says it's one of those top levels of confidence. What is the lowest of those three top levels of confidence? Of those top three, it would be highly likely. The other point that I would like to make with respect to the second issue on D, and it's something that Your Honor also mentioned with respect to the amount of time it takes. And Your Honor asked, so you're saying it should be as fast as possible, and Mr. Simmons' counsel agreed. And this was the same argument that was raised below, where Mr. Simmons' counsel said that the regulation required companies to put somebody on as soon as practicable. And the district judge correctly called him out on that and said that's not what the regulation says. It says that within a reasonable time, not to exceed 30 days. And under any version of the facts in this case, theirs or ours, it happened within 50 days. One half of the outer amount of time, the outer bound- 11 days from the allegation. January 9th was the very first call. January 20th was the very last call that he received. So it was four days. And then four days after that is when- More than 15 days. Right. But still, that's still half the amount of time that the regulation says is the outer bound of reasonableness. And so the suggestion that there's something that could go to the jury on that is something that the district judge correctly rejected and saying, no, look, even under their version of the facts, this is not a material dispute. And the last thing I'd like to mention, Your Honor, unless Your Honors have questions, is there's been some suggestion both in the briefing and then here again today that Mr. Simmons was deprived of an opportunity to really develop his record in a way that would allow him to defeat summary judgment. And that simply isn't so. There was a discovery schedule that was entered. The discovery schedule that was entered said you can take your discovery on the auto dialer claim, which was then at issue, and the do not call claim. And Mr. Simmons did, in fact, seek discovery on both of those claims, including on the do not call claim. There were multiple subpoenas issued. There was a corporate representative, Kenneth Link, who testified on the do not call claim. They served discovery requests, et cetera. And I think perhaps the most telling point is that when the district judge, and this is at A224, asked squarely, quote, what discovery have you not been able to take that you believe is necessary to oppose this motion? Mr. Simmons' counsel said, quote, I think we have the discovery necessary to oppose the motion. And then he said it repeatedly throughout the course of the record. So the notion that somehow the district judge had prejudiced them from being able to obtain the discovery that they needed to be able to defeat summary judgment, that just simply isn't consistent with the position that they took before the district court when the judge granted summary judgment. Unless your honors have questions, I'm happy to answer any. Those are the points that I'd like to make. Thank you. Thank you. I think that the arguments of many of these points have been pretty well ventilated at this point. I do want to pick up on one point that my friend raised. You asked, really, do we know how many confidence levels Relevate has, and how do we contextualize this top three confidence intervals remark? And, in fact, this question was asked at Mr. Link's deposition. Do you have any idea how many levels there are in total for Relevate? And he answered, I do not. I do not know. So, I mean, this gets back to our fundamental point. I mean, you could have 20 of them, and they could end with, you know, poor, rotten, and abysmal. Sure. And so the fact that it's three is less important than the fact that the third one, if, as your adversary has said, if the third one is highly likely, highly likely to be a match in this testimony, that it has to meet one, two, or three, and three is highly likely. I think, actually, one would have been highly likely, the way this played out. What is three? It would have been certain. Oh, no, no. Almost certain or highly likely. That was the way the question was phrased. The least certain three intervals was what? Colossal. I would also point out that Mr. Link couched his statement that they asked for the top three by saying, I shouldn't say that conclusively. I mean, that is the sum total of the evidence that this is where we're restricted. And I think you correctly noted that this is important for this defense, because really the rest of these procedures, this checking against the registry, it didn't happen in this case. So it all comes down to this. And I'd also point out. Can I ask you this? In looking at this defense, it doesn't matter, really, in this case, whether the scrubbing worked, because, in fact, they knew that it was on the list. But the fact that there are two layers of scrubbing, possible now, I guess, and an empirion, doesn't that matter now in this case? Because they do have these procedures in place. It was not a failure of those procedures that resulted in the phone call to your client. But they have these procedures in place. Doesn't it count in their favor? It does. I don't think it gets them as far as they need to go. No, I understand. Yes. I would agree that that's a point in their favor. Personally, I think that it would be better to have a more fulsome record on what exactly is happening when it gets scrubbed and how effective that is. At the moment, right, we know that they scrub. We didn't really run that down because, as I said, that whole process was ignored. Checking against lists. Sure, sure. I would imagine there's a few different ways of doing that, and it might be worth knowing exactly how they do that. If I could get back to one of the other points, and then I'll wrap up unless there are other questions. The point my friend made about entities in the business of skip tracing, I think it's telling that Mr. Link also said that they used multiple skip tracers because not everybody has the same sources, right? So they understand that there's going to be some inaccuracies there because these entities are using different... Well, it tolerates some inaccuracies. Sure, sure. It definitely tolerates some inaccuracies. And, again, we don't really know, though, what kinds of inaccuracies we're talking about here, and there's no reason to conclude. We know that there's some, and there's no reason to conclude from that that it's a tolerable level. So I will rest on our papers unless there are any other questions. Thank you. Thank you. Thank you both. We'll reserve decision.